IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GENERAL LAND OFFICE OF THE STATE OF TEXAS, | § § § | No. 1:23-CV-169-DAE |
| Plaintiff, | § § § | |
| vs. | § § | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, DEB HAALAND in her official capacity as Secretary of the Interior, UNITED STATES FISH AND WILDLIFE SERVICE, MARTHA WILLIAMS in her official capacity as Acting Director of the United States Fish and Wildlife Service, and AMY LUEDERS in her official capacity as Southwest Regional Director of the United States Fish and Wildlife Service, | § § § § § § § § § § § § § § | |
| Defendants, | § § § | |
| vs. | § § | |
| SAVE OUR SPRINGS ALLIANCE, | § § § | |
| Intervenor-Defendant. | § | |

ORDER: (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; (2) DENYING FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT; AND (3) DENYING INTERVENOR-DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

The matters before the Court are: (1) Plaintiff General Land Office of the State of Texas's ("Plaintiff" or "GLO") Motion for Summary Judgment (Dkt. # 55); (2) United States Department of the Interior, Deb Haaland, United States Fish and Wildlife Service (the "Service"), Martha Williams, and Amy Lueders's (collectively, "Federal Defendants") Combined Cross-Motion for Summary Judgment (Dkt. # 56), and Defendant-Intervenor Save Our Springs Alliance's ("Save Our Springs") Cross-Motion for Summary Judgment (Dkt. # 58).  On August 14, 2024, the Court held a hearing on these matters.  Upon careful consideration of the arguments raised by the parties in the briefing and at the hearing, the Court—for reasons that follow—**GRANTS** Plaintiff's motion, **DENIES** Federal Defendants' motion, and **DENIES** Save Our Springs's Motion.

<u>BACKGROUND</u>

Plaintiff brings this action against Federal Defendants compelling them to take certain actions under the Endangered Species Act, 16 U.S.C. §§ 1531–1544 ("ESA" or the "Act"), including: (1) declaring that Federal Defendants' Second 90-day Finding violated the Act; (2) vacating the Second 90-day Finding; and (3) granting other appropriate relief.  (Dkt. # 1.)

A.      Endangered Species Act

The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  Congress passed the EPA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."  Hill, 437 U.S. at 184.

Among others, the ESA requires the Secretary of the Interior and the Secretary of Commerce to determine whether any species should be listed as endangered or threatened according to five enumerated statutory factors.  See 16 U.S.C. §§ 1532(15), 1533(a).  Listing a species as endangered or threatened triggers certain legal protections.  See, e.g., id. §§ 1533–38.

The ESA tells the Service more about how to identify an endangered or threatened species.  For instance, the Service must act "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species."  Id. § 1533(b)(1)(A).  It may base its decision on "any of the following factors: (A) the present or threatened destruction, modification, or curtailment of [a species'] habitat or range; (B) overutilization for [enumerated]

3

purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." Id. § 1533(a)(1). By regulation, the Service has explained that it may use "any one or a combination of [those] factors." 50 C.F.R. § 424.11(c).

When a species is placed on the endangered list, the Service must concurrently designate the critical habitat of the species "to the maximum extent prudent and determinable." Id. § 1533(a)(3)(A)(i). A "critical habitat" consists of specific areas within the existing habitat containing physical and biological features essential to conservation that may require special protections, as well as specific areas beyond the existing habitat determined to be essential for conservation. Id. § 1532(5)(A). A critical habitat designation must account for the economic impact, the impact on national security, and "any other relevant impact" the designation might have. Id. § 1533(b)(2).

The ESA also directs the Service to "review" listed species "at least once every five years." 16 U.S.C. § 1533(c)(2)(A). "[O]n the basis of such [a] review," the Service may remove a species from the list or change the species from endangered to threatened (or vice versa). Id. § 1533(c)(2)(B). A species may be delisted if the best available scientific and commercial data available demonstrates the species is no longer endangered based on any of § 1533's five factors. Id.

4

§ 1533(c)(2)(B); 50 C.F.R. § 424.11(d).  There are three reasons why the best scientific and commercial data available may no longer support listing a species: (1) the species may have become extinct; (2) the species may have recovered to such a point that "protection under the Act is no longer required"; or (3) the original listing determination may have been based on erroneous data or an erroneous interpretation of the data.  50 C.F.R. § 424.11(d)(1)–(3).

Separately, an interested party may petition the Service to alter a species' listing, which can trigger a determination on the species' status.  See id. § 1533(b)(3)(A); 5 U.S.C. § 553(e); 50 C.F.R. § 424.14.  The Secretary must issue a finding within ninety days of receiving such a petition stating whether the petition presents "substantial scientific or commercial information indicating [delisting] may be warranted."[1]  Id.  "Substantial information is that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted."  50 C.F.R. § 424.14(b)(1).  If the Secretary determines the petition presents substantial information that delisting

---

[1] The definition for "substantial scientific or commercial information" was changed on October 27, 2016, to mean "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted."  50 C.F.R. § 424.14(h)(1)(i).  Because the earlier definition of "substantial scientific or commercial information" was in place when the relevant petition in this case was filed, the Court uses this definition as well.  See Am. Stewards of Liberty v. Dep't of the Interior, 370 F. Supp. 3d 711, 725 (W.D. Tex. 2019).

may be warranted, the Secretary must then commence a twelve-month status review to determine whether the species should be delisted. 16 U.S.C. § 1533(b)(3)(A), (B).  The Secretary's determination that a petition does not present substantial information is considered final agency action that may be reviewed by the district court.  Id. § 1533(b)(3)(C)(ii).

B.      Golden-Cheeked Warbler

The golden-cheeked warbler (*Setophaga chrysoparia*) ("Warbler") is a small, migratory songbird that breeds exclusively in parts of central Texas.  (Dkt. # 1 at 8.)  The Warbler arrives in Texas from late February through April, migrating afterward through Central America in July and August.  (Id.)  It is the only bird species that nests entirely in the state of Texas.  (Id.)  Warblers rely on areas in Texas with a mix of mature Ashe juniper trees and oak trees for breeding, nesting, and fledging their young.  (Dkt. # 56 at 11.)

In the wake of habitat loss for the Warbler in the 1980s because of widespread removal of Ashe juniper trees due to human development, on February 2, 1990, the Service received an emergency petition to list the Warbler on the endangered species list.  (Dkt. # 1 at 9.)  Based on this petition, on May 4, 1990, the Service issued an emergency rule temporarily listing the Warbler as endangered under the ESA.  (Id.)

6

Thereafter, on December 27, 1990, the Service issued a final rule placing the Warbler on the endangered species list.  Id.  The Service determined the Warbler was endangered due to the present and threatened destruction of its range, the threat of nest predation, the inadequacy of existing regulatory mechanisms, and the threat of habitat fragmentation.  (Id.)

The first five-year status review of the Warbler's endangered status did not occur until August 26, 2014.  The 2014 Review found that although progress had been made toward achieving the recovery criteria set out in the 1992 Recovery Plan, none of the criteria had yet been achieved, and the Warbler was still threatened by "the ongoing, wide-spread destruction of its habitat."  Gen. Land Office of Tex. v. U.S. Fish and Wildlife Serv., 2019 WL 1010688, at *2 (W.D. Tex. Feb. 6, 2019) ("Gen. Land Office I").[2]  The Service therefore concluded the Warbler remained in danger of extinction throughout its range and recommended no change to the Warbler's endangered status.  Id.

### 1.    Petition to Delist

On June 29, 2015, less than one year after the 2014 Review concluded the Warbler should remain on the endangered list, Texans for Positive Economic Policy, Susan Combs, the Texas Public Policy Foundation, and the Reason Foundation ("Petitioners") submitted a petition to remove the Warbler from the

---

[2] Many of the facts cited in this case are taken from Gen. Land Office I.

endangered species list (the "90-day Petition" or the "Petition").  (Dkt. # 1 at 10.)

The Petition relied primarily on an "exhaustive survey" of the existing scientific

literature prepared by the Texas A&M Institute of Renewable Natural Resources

("2015 Texas A&M Survey").  (Dkt. # 1-4 at 14.)  The Petition argued that the

initial listing decision relied on evidence from 1990 that underestimated the

Warbler's population size and the extensiveness of its breeding habitat.  (Id. at 14–

17.)  According to the Petition, evidence in the 2015 Texas A&M Survey—which

evidence was also considered in the 2014 Review—demonstrated that the

Warbler's breeding habitat was more widely distributed and variable than was

initially assumed.  (Id. at 19.)  Thus, the Petition maintained that the Warbler

population was much larger than recognized in 1990.  (Id.)  Ultimately, the Petition

stated that application of the best scientific and commercial information indicates

that the Warbler does not meet the ESA's statutory factors for listing, and it is

"ineligible for continued listing as an endangered species."  (Id. at 14.)

### 2.    First 90-Day Finding

On June 3, 2016, the Service made a negative 90-day finding,

denying the Petition ("First 90-Day Finding"), determining that there continues to

be "on-going, widespread destruction of [Warbler] habitat" and that the bird is still

in danger of extinction.  (Dkt. # 1-5 at 11.)  Within the finding, however, the

Service acknowledged that the "known potential range is more extensive than

when the [Warbler] was originally listed." (Id.)  Still, the First 90-Day Finding

stated that the Petition did not include any information the Service had not already

considered during its 2014 Review.  (Id.)

### 3.    General Land Office I

On June 5, 2017, the GLO filed suit in this Court against the Service

and other defendants, challenging the First 90-Day Finding as being in violation of

the ESA and its implementing regulations as arbitrary and capricious.  Gen. Land

Office I, 2019 WL 1010688.  On February 6, 2019, the district court[3] upheld the

First 90-Day Finding, determining, among others, that the Service's First 90-Day

Finding was not arbitrary and capricious, and that the GLO did not show that:

(1) "the Service required the [Petition] to present conclusive evidence indicating

delisting may be warranted"; (2) "the Service ignored evidence in the [Petition]";

or (3) "the Service resolved scientific disputes against granting the Petition to

Delist." Id. at *9.

The GLO appealed the district court's ruling, and on January 15,

2020, the Fifth Circuit Court of Appeals reversed, holding that the First 90-Day

Finding violated the ESA and was arbitrary and capricious.  Gen. Land Office v.

U.S. Dep't of Interior, 947 F.3d 309 (5th Cir. 2020).  The Fifth Circuit determined

that although the Service *recited* the correct standard for review in the First 90-Day

---

[3] This case was assigned to then-active U.S. District Judge Sam Sparks.

9

Finding—"substantial scientific or commercial information indicating that the petitioned action may be warranted"—the Service "*applied* an inappropriately heightened one." Id. at 320–21 (emphasis in original). The Fifth Circuit found the standard to be heightened because, "to proceed to the twelve-month review stage, the Service required the delisting petition to contain information that the Service had not considered in its five-year review that was sufficient to refute that review's conclusions." Id. at 321. Therefore, the Fifth Circuit held that "[t]he Service thus based its decision to deny the delisting petition on an incorrect legal standard," and the decision was thus "arbitrary and capricious." Id. The Fifth Circuit remanded to the Service for reconsideration of the Petition, ordering the Service to evaluate the Petition under the correct legal standard. Id.

4.     Second 90-Day Finding

After remand from the Fifth Circuit, on July 27, 2021, the Service published a new 90-day finding on the Petition ("Second 90-Day Finding"). 86 Fed. Reg. 40186 (Dkt. # 1-8). Once again, the Service determined that the Petition did not "provide substantial scientific or commercial information indicating that the petitioned action may be warranted." (Dkt. # 1-8 at 15.) The evidence presented in the Petition and the Service's response in the Second 90-Day Finding is summarized below.

a. Factor A: Present or threatened destruction or modification,
   or curtailment of the Warbler's habitat or range

The primary threat to the Warbler identified in 1990 was the potential loss of habitat driven by "rapid suburban development and human population growth" in central Texas. (Dkt. # 1-8 at 7.) The Petition attempts to refute this threat. (Dkt. # 1-4 at 55.) For instance, the Petition argues that listing the Warbler was either originally in error or that the species has since recovered. (Id.; Dkt. # 1-8 at 4.) The Petition cites several studies which it contends show that the numbers of Warblers and their habitat is far greater than the Service determined in 1990, and that the Warbler is not, nor was it ever, endangered in Texas. (Dkt. # 1-4 at 55–84.)

The Service acknowledges in the Second 90-Day Finding that "the known potential range is geographically more extensive than when the golden-cheeked warbler was originally listed in 1990." (Dkt. # 1-8 at 5.) Additionally, the Service notes the Petition's citation to studies which show that the Warbler population was higher than estimated at the time of listing; the Service considers these studies "to be accurate for purposes of evaluating the information in the petition." (Id.) Nevertheless, the Service states in the Second 90-Day Finding that "the ESA does not base listing determinations solely or predominantly on population and range size," but instead "requires an evaluation of the five factors in 16 U.S.C. § 1553(a)." (Id. at 5–6.) Regarding these factors, the Service found that "[t]he most serious threats described in the original listing rule, and which are

11

well documented in the literature that is readily available in the Service's files, remain, and recovery criteria have not been accomplished."  (Id. at 6.)

The Service also criticizes the Petition's habitation fragmentation discussion because it does not articulate whether habitat fragmentation is a threat to the Warbler but instead states only that "studies emphasize the importance of large and small patches to sustain the warbler population on its breeding ground." (Dkt. # 1-8 at 6.)  The Service states that although all patches of habitat are important, larger more connected patches are especially important for sustaining Warbler habitat and the Petition fails to recognize this.  (Id.)

The Service also discusses the Petition's brief mention of Warbler habitat loss from 1990-2001, but that the Petition's own cited studies show that "increasing urbanization, habitat loss, and habitat fragmentation within the range of the golden-cheeked warbler are adversely affecting the warbler."  (Dkt. # 1-8 at 6.)  The Service then notes that the cited studies show that a "29% reduction in warbler habitat was detected from 2001-2011, and range-wide breeding habitat experienced large declines during that same timeframe."  (Id.)  The Second 90-Day Finding cites studies which show that "Warblers require a larger minimum patch-size for pairing success in an urban environment than warblers in a rural environment," suggesting that each of the studies cited in the Petition indicate that

12

"increasing habitat destruction and fragmentation negatively affect warblers and warbler populations."  (Id. at 7.)

The Service also states in its Second 90-Day Finding that "human population has increased by nearly 50 percent from 1990 to 2010," and that projections indicate that human population will increase by 64% within the areas of the Warbler breeding range.  (Dkt. # 1-8 at 7.)  Regarding this data, the Service criticizes the Petition for failing to address "the threat of human population growth and increasing pressure from development."  (Id.)  And, because the Petition "does not provide any scientific data or analysis of existing data that shows a decrease in threats to the warbler associated with present and future habitat destruction and fragmentation," the Service concludes that the Petition "does not provide substantial information that delisting the warbler may be warranted based on present or threatened destruction, modification or curtailment of the species' habitat or range (Factor A)."  (Id.)

> b.  Factor B: Overutilization for commercial, recreational, scientific, or educational purposes

Regarding Factor B, the Service noted that the Petition and the 2015 Texas A&M Survey did not provide scientific data or analysis of data regarding the threat of overutilization.  (Dkt. # 1-8 at 8.)  The Service thus determined that the Petition "does not provide substantial information that delisting the warbler may be

warranted based on overutilization for commercial, recreational, scientific, or educational purposes." (Id.)

### c.  Factor C: Disease or Predation

The Petition claims that delisting is warranted based on the disease and predation factor. (Dkt. # 1-4 at 23.) Specifically, the Petition asserts that neither disease nor predation constitute a significant threat to the Warbler. (Id.) The Service concludes, however, that the Petition and the 2015 Texas A&M Survey fail to provide substantial information to support this claim. (Dkt. # 1-8 at 8–9.) The Service states that "[w]hile the threat from disease is not considered to be a significant threat to the warbler, nest parasitism and nest depredation, both of which vary across the range of the warbler, are exacerbated by habitat fragmentation and are considered to be moderate threat." (Id.) The Service concludes in its Second 90-Day Finding that the Petition fails to "reference any scientific data or analysis of existing data that calls into question threats to the warbler associated with disease and predation," and thus the Petition "does not provide substantial information that delisting the warbler may be warranted based on disease or predation (Factor C)." (Id.)

14

d.  Factor D: Inadequacy of existing regulatory mechanisms

Petitioners also contend that delisting is warranted based on the adequacy of existing regulatory mechanisms factor.  (Dkt. # 1-4 at 23.)  The Petition states that "[d]ue to the overlap and redundancy in state and federal regulatory mechanisms, delisting the golden-cheeked warbler under the [ESA] will not deprive it of any significant regulatory protections."  (Id.)  Specifically, the Petition asserts that the Migratory Bird Treaty Act of 1918 and the 1975 Texas Endangered Species law, among others, will sufficiently protect the Warbler if it is delisted.  (Id. at 23–24.)

The Service notes that some of the regulations cited by Petitioners may protect the Warbler, but not all of them will prohibit habitat destruction, "which is an immediate threat to the warbler."  (Dkt. # 1-8 at 10.)  Regarding habitat destruction, the regulations cited by Petitioners—Balcones Canyonlands National Wildlife Refuge, the Balcones Canyonlands Preserve, and approximately 160 habitat conservation plans ("HCPs")—do not, according to the Service, adequately protect the Warbler.  (Id.)  The Service cites the Petition's own studies which show that despite regulatory protections aimed at protecting Warbler habitat, "an estimated 29 percent of existing breeding season habitat was lost between 1999–2001 and 2010–2011," indicating that, "but for the protections of the [ESA],

15

adequate regulatory mechanisms do not exist to prevent continued destruction of warbler breeding habitat in Texas." (Id.)

Additionally, the Service determined that Petitioners failed to provide any scientific data or analysis of data showing a decrease in threats to the Warbler due to adequate regulatory mechanisms. (Dkt. # 1-8 at 11.) The Service therefore concluded that the Petition "does not provide substantial information that delisting the warbler may be warranted based on inadequacy of existing regulatory mechanisms." (Id.)

e. Factor E: Other natural or manmade factors affecting its continued existence

The Petition contends that delisting is also warranted based on a lack of other natural or manmade factors affecting the Warbler's continued existence. (Dkt. # 1-4 at 28.) Petitioners assert that "[b]ecause [the Service] erroneously concluded that few birds existed and little habitat was available for the species, [the Service] mistakenly concluded that any encroachments on warbler habitat would threaten the continued survival of the species." (Id.) The Petition asserts the Service was wrong in its initial conclusions and that habitat fragmentation, habitat degradation, forest management practices, and noise are not threats and therefore the Warbler should be delisted. (Id. at 29–30.)

The Service, however, determined in its Second 90-Day Finding that "habitat fragmentation, habitat degradation, inappropriate habitat management

16

practices, and excessive noise all contribute to reductions in overall warbler habitat quantity and quality and present a significant threat to the long-term viability of the species." (Dkt. # 1-8 at 12.) The Service cites studies which suggest that the quality of breeding for the Warbler is reduced by small patch sizes, reduced oak recruitment, and unsustainable forestry practices. (Id.) Additionally, the Service determined that although the Petition discussed some of these threats by describing research on warbler habitat quality that has resulted in conflicting conclusions, the research cited and "other readily available information in the Service's files," describe how certain factors adversely affect the Warbler to varying degrees. (Id.) For instance, oak wilt, fire, vegetation management, road and construction noise, and patch size are discussed in the Petition, but the Service concludes that conflicting data on these other natural and manmade disturbances does not convince the Service that delisting is warranted on these bases. (Id. at 13.)

The Service concludes that although the Petition "provides information and cites data indicating that the warbler faces some threats associated with other natural or manmade factors," the Petition "does not provide substantial information that delisting the warbler may be warranted based on other natural or manmade factors affecting its continued existence (Factor E)." (Dkt. # 1-8 at 14.) Additionally, the Service notes studies which suggest that the Warbler "is subject to additional threats including the potential consequences of climate change (that is,

17

increased risk of catastrophic wildfire and range shifts or restrictions . . .) and recreation," which were not discussed in the Petition.[4]  (Id.)

### f. Petition Finding

The Service concluded its Second 90-Day Finding by determining that although the Petition "provided information indicating that the warbler population is larger now than it was estimated at the time of listing and argues that the threats considered at the time of listing no longer threaten the species," the "argument is refuted by readily available information, in the Service's files, including many studies cited in the petition itself."  (Dkt. # 1-8 at 14.)  Additionally, the Service states that the Petition fails to "provide any scientific data or analysis of existing data showing that threats to the warbler are minimal enough that the petitioned action to delist the warbler may be warranted."  (Id.)

Recognizing that the Warbler's known potential range is more extensive than when it was originally listed in 1990, the Service expresses its concern that the Warbler "has very particular habitat needs and important threats, especially those associated with habitat destruction and habitat fragmentation, that are ongoing and expected to impact the continued existence of the warbler in the

---

[4] The Court notes that the threat of wildfire is not a hypothetical one in Texas as the State of Texas recently experienced one of the most destructive wildfires in the state's history in North Texas.

foreseeable future." (Id. at 14–15.)  The Service states that such threats are "likely

to be exacerbated by future human development and climate change."  (Id. at 15.)

Given all of this, the Service determined in its Second 90-Day Finding

that "[b]ased on [its] review of the petition, sources cited in the petition, and other

information in [its own] files," the Petition "does not provide substantial scientific

or commercial information indicating that the petitioned action may be warranted."

(Dkt. # 1-8 at 15.)

C.    Current Lawsuit

On October 11, 2021, pursuant to the citizen suit provision of the

ESA, 16 U.S.C. § 1540(g)(2), GLO provided a 60-day notice of intent to file suit

against the Service to the Federal Defendants.  (Dkt. # 1-1.)  On January 12, 2022,

the GLO filed its complaint in the Waco Division of this Court, asserting claims

against the Federal Defendants for: (1) violating the Fifth Circuit's remand order

by impermissibly requiring the 90-day Petition to contain new information that the

Service had not considered during its previous five-year review; (2) impermissibly

requiring Petitioners to show proof of recovery at the 90-day stage;

(3) impermissibly using the Service's species recovery plan as the determinative

factor in denying the 90-day petition; (4) impermissibly failing to properly

consider information in the 90-day petition regarding habitat fragmentation,

urbanization, disease, and predation; (5) impermissibly failing to properly consider

19

substantial information set forth in the 90-day petition demonstrating increases in the Warbler's population and habitat; and (6) impermissibly ignoring substantial information set forth in the 90-day petition showing the original scientific or commercial data used at the time the Warbler was listed were in error.  (Dkt. # 1.)

On December 20, 2022, the Honorable Alan Albright adopted the Magistrate Judge's report and recommendation, granting Federal Defendants' motion to change venue to the Austin Division of this Court.  (Dkt. # 30.)  The case was thereafter assigned to the Honorable Lee Yeakel, who granted Save Our Springs's motion to intervene as a defendant in this case on March 30, 2023.  (Dkt. # 32.)  This case was reassigned to the undersigned on April 27, 2023, following Judge Yeakel's retirement.  (Dkt. # 39.)

On December 19, 2023, the GLO filed its motion for summary judgment.  (Dkt. # 55.)  On February 19, 2024, the Federal Defendants filed a response in opposition as well as a cross motion for summary judgment.  (Dkt. # 56.)  On February 26, 2024, Save Our Springs filed a response in opposition to the GLO's summary judgment motion, as well as its own cross-motion for summary judgment.  (Dkt. # 58.)  On April 2, 2024, the GLO filed a reply to its motion and a combined response in opposition to both the Federal Defendants and Save Our Springs's motions for summary judgment.  (Dkt. # 59.)  On May 3, 2024, the Federal Defendants filed a reply in support of their motion for summary

judgment.  (Dkt. # 60.)  On May 10, 2024, Save Our Springs filed a reply in support of its motion for summary judgment.  (Dkt. # 61.)  The motions are now ripe and ready for review.

LEGAL STANDARDS

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a).  In the context of a challenge to an agency action under the Administrative Procedure Act ("APA"), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review."  Blue Ocean Inst. v. Gutierrez, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Therefore, in evaluating a case on summary judgment, the Court applies the standard of review from the APA.  See Shell Offshore Inc. v. Babbitt, 238 F.3d 622, 627 (5th Cir. 2001); see also Tex. Oil & Gas Ass'n v. EPA, 161 F.3d 923, 933 (5th Cir. 1998).

Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  A 90-day finding that delisting is not warranted is subject to judicial review under the Act.  See 16 U.S.C.

21

§ 1533(b)(3)(C)(ii) ("Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.").  Under the APA, an agency action cannot be overturned unless the agency's legal conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law."  5 U.S.C. § 706(2)(A); see also Loper Bright Enters. v. Raimondo, 603 U.S. 837 (2024).[5]

When reviewing for arbitrariness and capriciousness, a court considers whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).  Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not

---

[5] At the hearing, the parties argued whether the recent Supreme Court decision in Loper Bright Enters., 467 U.S. at 837, alters the Court's judicial review of the matters raised in this case.  Loper Bright addressed the question of whether federal courts must "defer to an agency interpretation of the law simply because a statute is ambiguous," overruling Chevron U.S.A., Inc. v. Nat'l Res. Defense Council, Inc., 467 U.S. 837 (1984).  Here, the Court finds this case does not require resolution of any dispute concerning statutory interpretation and no party has sought to defend or attack the Service's challenged action in this case based on Chevron.  Accordingly, the Court concludes that, without further guidance from either the Fifth Circuit or the Supreme Court, Loper Bright does not alter the analysis of the parties' arguments in this case, nor has either party suggested it does.

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.  The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." Id.  Nor should the court "reweigh the evidence." Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Instead, this court looks to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Judulang v. Holder, 565 U.S. 42, 53 (2011).  Even though arbitrary-and-capricious review is narrow, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." Id.

DISCUSSION

Each of the parties have moved for summary judgment.  The GLO moves for summary judgment on four different bases.  First, the GLO argues the Service violated the Fifth Circuit's remand instructions by once again reciting the correct standard of review but applying an incorrect standard when it found that the Petition "does not report any new data or study results … but summarizes readily available information about the [Warbler] and its habitat." (Dkt. # 55 at 18.)  Second, the GLO argues the Service once again ignored, downplayed, or misconstrued substantial data presented throughout the Petition, despite usually

23

accepting a petitioner's sources and characterizations of information unless it has information to the contrary.  (Id.)  Third, the GLO contends the Service impermissibly required Petitioners to present conclusive evidence at the 90-day stage that the Warbler has recovered.  (Id. at 19.)  And fourth, the GLO maintains the Service failed to address whether the original population and habitat data upon which the Warbler was enlisted as endangered in 1990 were in error.  (Id.)  The GLO contends the Court should order the Service to make a positive 90-day finding and begin a 12-month review of the Petition.[6]

The Federal Defendants' motion maintains the Service applied the correct legal standard when it evaluated the Petition, and that it carefully considered the Petition's arguments in favor of delisting the Warbler, reasonably determining that the Petition failed to provide substantial information indicating that the petitioned action may be warranted.  (Dkt. # 56 at 18–19.)  Additionally, the Federal Defendants contend the Service did not require the Petition to present any "new information" that was not analyzed in the five-year review, nor did the

---

[6] The Court acknowledges, as did the parties at the hearing, that the Petition is now almost ten years old, and that a new five-year review is near completion and that the Service will soon publish its findings.  As the Service represented at the hearing, the new five-year review "will be based on the most up-to-date, best-available science instead of what [the parties] are working with in this record, which is 10 years old at this point."  (Rough Transcript at 20–21.)  Nevertheless, this Court is compelled to decide these motions based upon the current record as presented by the parties.

24

Service rely on a 1992 Golden-Cheeked Warbler Recovery Plan ("Recovery Plan") in the First 90-Day Finding. (Id. at 31.) The Federal Defendants also assert that the GLO is barred from raising its critical habitat claim and it is irrelevant to the First 90-Day Finding. (Id. at 35.) The Federal Defendants further argue that the GLO's requested remedy is incompatible with the basic principles of administrative law and that should the Court find in favor of the GLO, remand is the proper remedy. (Id. at 36.)

Save Our Springs's motion for summary judgment argues that the Service properly denied the Petition and that the Service has complied with the Fifth Circuit's remand instructions. (Dkt. # 58.) Save Our Springs also contends that an order directing the Service to proceed to a twelve-month review would not be appropriate. (Id.)

## I.    Standing

The GLO's motion first asserts its standing to bring this case. (Dkt. # 55 at 20.) Indeed, the Court recognizes that the GLO has standing to bring its claims pursuant to its zone of interests protected by Section 4 of the ESA, which provides that negative 90-day findings on petitions to delist are judicially reviewable. See 16 U.S.C. § 1553(b)(3)(C)(ii).

II.    Standard of Review

The GLO argues the Service repeated the same error in its Second 90-Day Finding as it did in its First 90-Day Finding, requiring the Petition to contain new information not previously considered by the Service. (Dkt. # 55 at 22.) Although it cited the correct legal standard in effect at the time of the 2015 Petition, the GLO asserts the Service applied a heightened, more stringent standard in considering the Petition. (Id.)

The relevant regulation requires:

> To the maximum extent practicable, within 90 days of receiving a petition to list, delist, or reclassify a species, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. For the purposes of this section, "substantial information" is that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted.

50 C.F.R. § 424.14(b)(1) (2014). In making such finding, the applicable statute requires the Secretary to consider whether the Petition: (1) "[c]learly indicates the administrative measure recommended and gives the scientific and any common name of the species involved"; (2) "[c]ontains detailed narrative justification for the recommended measure, describing, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species"; (3) "[p]rovides information regarding the status of the species over all or a significant portion of its range"; and (4) "[i]s accompanied by appropriate

26

supporting documentation in the form of bibliographic references, reprints of pertinent publications, copies of reports or letters from authorities, and maps." Id. § 424.14(b)(2).

Regarding these factors, the GLO argues that the Petition contains more than sufficient information to pass the 90-day review. (Dkt. # 55 at 23.) The GLO maintains that the 2015 Texas A&M Survey established facts that the Warbler breeding habitat is five times larger, and the Warbler population is far greater than first believed in 1990. (Id.) Additionally, the GLO contends the Petition detailed the inherent flaws in the Service's prior five-year review, including that the review failed to consider studies on "the state of scientific knowledge concerning the [W]arbler" and then properly apply the conclusions of those studies. (Id. at 24, 119.)

The GLO further maintains that because Service acknowledges in its Second 90-Day Finding that "the known potential range of [Warbler habitat] is geographically more extensive than when the [Warbler] was originally listed in 1990," and that the Petition "cites studies showing higher [W]arbler population numbers than estimated at the time of the listing, which [the Service] consider[s] to be accurate for purposes of evaluating information in the [P]etition," then this is sufficient for the Service to conclude that the Petition should be granted and a twelve-month study should follow. Nonetheless, according to the GLO, the

Service failed to apply the correct standard of review and disregarded the 2015 Texas A&M Survey, concluding that it "does not report any new data or study results regarding the [W]arbler, but summarizes readily available information about the [W]arbler and its habitat . . . ." (Id. at 25, 236.)  The GLO contends the Service once again acted arbitrarily and capriciously in denying the Petition in its Second 90-Day Finding.  (Id. at 25.)

In response, the Federal Defendants maintain the Service both recited and applied the correct legal standard in considering the Petition on remand from the Fifth Circuit.  (Dkt. # 56 at 17.)  The Federal Defendants argue the GLO relies on one line from the Second 90-Day Finding to demonstrate the Service required conclusive proof of the species' recovery—that new population estimates were not "indicators of positive trends . . . and thus do not imply recovery." (Id. at 17–18, Dkt. # 55 at 179.)  Instead, according to the Federal Defendants, this one line does not show the Service required conclusive proof, but only that the Service looked for information that provided at least an implication that the species might have recovered.  (Dkt. # 56 at 18.)  The Federal Defendants argue that this is consistent with the requirement that a petition present substantial information indicating that delisting may be warranted.  (Id.)

Save Our Springs also contends that, contrary to the GLO's arguments, the Service did not require the Petition to contain "new information"

28

that had not already been considered.  (Dkt. # 58 at 26.)  Instead, according to Save Our Springs, the Service's observation that the 2015 Texas A&M Survey "does not report any new data or study results regarding the warbler," was simply the Service's acknowledgment that the Survey was not primary research but only a compilation of findings from primary research papers about the Warbler.  (Id.) Therefore, because the 2015 Texas A&M Survey is not a scientific article, the Service discussed the findings of various scientific articles compiled within the Survey, and Save Our Springs thus argues that there is no evidence the Service disregarded the 2015 Texas A&M Survey or faulted Petitioners for relying on it. (Id. at 27.)

Again, ESA regulations define "substantial information" as "the amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted."  50 C.F.R. 424.14(b).  In other words, the 90–day review of a listing petition is a cursory review to determine whether a petition contains information that warrants a more in-depth review.  The Court therefore will use this standard to determine whether the Service acted arbitrarily and capriciously in concluding the Petition failed to present substantial evidence.

29

Upon careful consideration of both the Petition and the Second 90-Day Finding, the Court finds the Service violated its regulations when it required the GLO to essentially present conclusive evidence about the Warbler's population recovery. The Service's regulations require a petition to present only "available information," and the Service committed a clear error in judgment and acted arbitrarily, capriciously, and not in accordance with the law when it called for more evidence than the law requires. For the reasons that follow, the Court will vacate the Second 90-Day Finding and remand the finding to the Service for further consideration of the GLO's position based on available population and habitat information.

In denying the Petition, the Service again reviewed the 2015 Texas A&M Survey finding that although the Survey "represent[s] the most recent and comprehensive efforts to estimate range-wide warbler habitat and population size to date," the Service noted that "these efforts represent new estimates rather than indicators of positive trends in warbler habitat and population size, and thus do not imply recovery." (Dkt. # 1-8 at 5.) The Service also discussed the 2012 "Mathewson study" and that it used a "liberal estimate of habitat," indicating that "the total potential habitat estimate used in these studies is not a reliable indicator of actual warbler range, and overestimated habitat area may have had some effect on the total population size estimates." (Id.)

30

However, as mentioned, the Second 90-Day Finding acknowledges that "the known potential range is geographically more extensive than when the golden-cheeked warbler was originally listed in 1990," and that the Petition "cites studies showing higher warbler population numbers than estimated at the time of listing, which [the Service] consider[s] to be accurate for purposes of evaluating the information in the petition."  (Dkt. # 1-8 at 5.)  And, while the Service goes on to state that it "does not base listing determinations solely or predominantly on population and range size," id., the Service thereafter failed to consider that the Petition's cited scientific population and range size studies might in fact lead a reasonable person to believe the measure proposed in the Petition—that delisting may be warranted—constitutes substantial information supporting that measure. 50 C.F.R. § 424.14(b)(1) (2014).

The Service also evaluated listing determinations on more factors than population and range size, stating that "the most serious threats described in the original listing rule, and which are well documented in the literature that is readily available in the Service's files, remain, and recovery criteria have not been accomplished."  (Dkt. # 1-8 at 6.)  See Ctr. for Biological Diversity v. Morgenweck, 351 Supp. 2d 1137, 1142 (D. Co. 2004) ("Of course [the Service] can rely on what is within its own expertise and records to reject petitions consistent with ESA standards.").  Specifically, the Service recites that "[h]abitat

destruction, fragmentation, and degradation remain real and significant threats to the continued existence of the warbler," and that the Petition fails to "present substantial information indicating" that these threats "may no longer threaten the species with extinction." (Id.)  The Service, however, in making these findings, downplays the Petition's evidence that these threats to the Warbler might not be as dire as was predicted at the Warbler's initial listing given the *available information* cited within the Petition that suggests the population and range size are much larger than originally known.  See § 424.14(b)(2).  Indeed, the regulations require only that a petition "[c]ontain detailed narrative justification for the recommended measure, describing, *based on available information*, past and present numbers and distribution of the species involved and any threats faced by the species."  Id. § 424.14(b)(2) (2014) (emphasis added).  Given this, the Service must make each listing determination "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

Regarding the Service's cited threats above in its Second 90-Day Finding, the Service criticizes the Petition's general discussion of habitat fragmentation stating that the Petition does not "articulate whether or not habitat fragmentation is a significant threat to the warbler."  (Dkt. # 1-8 at 6.)  In contrast, the Service cites other studies which conclude that "the conservation of large blocks of habitat is especially important for ensuring the long-term viability of the

species." (Id.)  The Second 90-Day Finding goes on to express its concern that habitat loss and habitat fragmentation "are primarily driven by rapid suburban development and human population growth in Travis, Williamson, Bexar and surrounding counties," and that "[i]n the warbler breeding range, the human population has increased by nearly 50 percent from 1990 to 2010." (Dkt. # 1-8 at 7.)  Furthermore, the Service notes that human population projections from 2010 to 2055 for counties within the warbler breeding range report another projected 64% increase in the human population.  (Id.)

However, in requiring the Petition to present substantial information that these threats no longer threaten the Warbler with extinction, the Service places a heightened burden on the GLO at the 90-day petition stage to disprove the essential assumption of the 1990 listing—that the Warbler population would decline as the population increases because of dangers to its habitat.  At the 90-day stage, "[i]t would be wrong to discount the information submitted in a petition solely because other data might contradict it . . . unless the Service has demonstrated the unreliability of the information that supports the petition." Ctr. for Biological Diversity v. Kempthorne, No. C 06-04186 WHA, 2007 WL 163244, at *4 (N.D. Cal. Jan. 19, 2007).  Here, the Service has not demonstrated the unreliability of any of the cited studies in the Petition.  In fact, as mentioned, the Service does not disagree with the Petition's findings on population size and range.

33

In reaching the conclusion that the Service placed a heightened burden on the GLO at the 90-day stage, the Court recognizes that the evidence presented in the Petition is not conclusive proof that the Warbler's population or habitat range is actually increasing or that an increase in human population and the other threats to the Warbler identified by the Service will not detrimentally affect the Warbler's habitat. Cf. Am. Stewards of Liberty, 370 F. Supp. 3d at 729–30 (making same finding when considering the Service's denial of 90-day petition on endangered harvestman spider). "At the 90-day stage, the question is not whether the designation is warranted, only whether it may be." Kempthorne, 2007 WL 163244, at *7. "The standard requiring consideration of whether a 'reasonable person' would conclude that action 'may be warranted' contemplates that where there is disagreement among reasonable scientists, then the Service should make the 'may be warranted' finding and then proceed to the more-searching next step in the ESA process." Id.

The Court thus "concludes only that the evidence presented in the [P]etition meets the *low evidentiary threshold* set forth in the Act and implementing regulations for a 90-day finding—that delisting the [Warbler] *may* be warranted." Am. Stewards of Liberty, 370 F. Supp. 3d at 728 (emphasis added). "The Service may determine after a more searching inquiry whether the [Warbler]

34

is, in fact, increasing, and whether delisting of the species definitively is or is not warranted." Id. (citing 16 U.S.C. § 1533(b)(3)(B)).

III.    Proof of Recovery

The GLO also contends the Service impermissibly required the Petition to show proof of recovery at the 90-day review stage.  (Dkt. # 55 at 25.) The GLO maintains that nothing in the ESA's regulations require a petition for delisting to show definitive proof that a species has recovered at the 90-day review stage.  (Id.)  The GLO takes issue with the Service's statements that the Petition represents "new estimates rather than indicators of positive trends in warbler habitat and population size, and thus do not imply recovery," and that the "most serious threats described in the original listing rule … remain, and recovery criteria have not been accomplished."  (Id.; Dkt. # 1-8 at 5, 6.)  Therefore, according to the GLO, the Second 90-Day Finding inappropriately required the Petition to offer conclusive proof that the Warbler had recovered at the 90-day review stage.  (Id. at 26.)

In response, the Service contends that it is the petitioner's burden to submit substantial information addressing each of the five factors and indicating that delisting the species may be warranted.  (Dkt. # 56 at 22.)  Regarding this burden, the Service asserts that the Petition only addressed four of the five delisting factors and that many of the cited studies in the Petition documented

35

serious, ongoing threats to the Warbler, particularly in regard to habitat loss and fragmentation.  (Id. at 22–23.)  The Service therefore maintains that after examining information presented in the Petition, as well as information within the Service's own files, the Service exercised its scientific expertise, rationally concluding that a reasonable person would find the Petition did not provide substantial information indicating that delisting the Warbler may be warranted.  (Id. at 23.)

A petitioner must present "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted."  50 C.F.R. § 424.12(b)(1) (2014).  As discussed above, although the Service carefully considered the Petition's arguments in favor of delisting and agreeing that recent estimates suggest greater amounts of Warbler habitat exist than was originally thought, the Service placed a heightened burden on the GLO at the 90-day review stage to demonstrate that the Warbler population was not declining. The Service cites studies which suggest the Warbler faces significant threats to survival and that, once Warbler habitat is lost, it is unlikely to be restored.  (See Dkt. # 56 at 23 (citing Dkt. # 1-4 at 14, Administrative Record ("AR") at 1919, 8098).)  In so doing, the Service disregards the available information cited in the Petition in which a reasonable person could conclude that despite the threats the Warbler might face, its population and range size are sufficient to withstand such

threats.  (See, e.g., Dkt. # 1-4 at 28–30.)  The Court thus finds the Service acted unreasonably in denying the Petition based on Petitioners' lack of proof of recovery.  (Id. at 23.)

IV.    Recovery Plan

The GLO also argues that the Service impermissibly used its own Warbler Recovery Plan as a determining factor when denying the Petition by stating that "recovery criteria have not been accomplished."  (Dkt. # 55 at 26.)  The GLO asserts that in considering the Petition, the Service impermissibly based its decision in the Second-90 Day Finding on its own species recovery plan.  (Id.)

In response, the Federal Defendants assert that it did not use the 1992 Recovery Plan as a "determining factor" in denying the Petition.  (Dkt. # 56 at 33–34.)  Instead, the Federal Defendants maintain the Service based its decision to deny the Petition solely on the Petition's evidence regarding the statutorily required listing criteria.  (Id. at 34.)  Regarding this, the Federal Defendants contend that the Second 90-Day Finding does not include any section that evaluates the species' recovery criteria or recovery plan.  (Id.)  Instead, the Federal Defendants' point out the Petition's own 11-page discussion which claims that all action items in the 1992 Recovery Plan have been met.  (Id. (citing AR 119–29).)  The Federal Defendants assert that the Service simply responded to this argument by stating in

37

one line its disagreement with the Petition because "recovery criteria have not been accomplished." (Id. (citing AR 8098).)

The Court agrees with the Federal Defendants. In considering the Petition's arguments and evidence concerning the 1992 Recovery Plan criteria, the Service found that, after evaluating the five statutory § 1533 factors, "[t]he most serious threats described in the original listing rule, and which are well documented in the literature that is readily available in the Service's files, remain, and recovery criteria have not been accomplished." (AR at 8098.) As Federal Defendants argue, the Service does not specifically address the 1992 Recovery Plan in the remainder of the Second 90-Day Finding.[7] Instead, the Second 90-Day Finding carefully considered each of the statutory factors, basing its decision on these and not on the 1992 Recovery Plan. In making its argument, the GLO has apparently cherry-picked one phrase from the Service's finding, and thus the Court concludes the Service has not inappropriately used its own species recovery plan as a determining factor in denying the Petition.

---

[7] The Second 90-Day Finding mentions the "recovery strategy for the species" in the existing regulatory mechanisms factor section but only in reference to species protection in certain areas. (AR at 8103.)

V.    Consideration of Substantial Data

In somewhat repeated arguments, the GLO argues the Service did not properly consider substantial data in the Petition showing that the original Warbler listing was in error and that delisting may be otherwise appropriate. (Dkt. # 55 at 27.) The GLO contends the Petition presented substantial scientific and commercial information demonstrating remarkable increases in Warbler population and habitat since it was originally listed. (Id.) In such case, the GLO maintains this information calls into question whether the original data used to justify the Warbler's listing, or the Service's interpretation of it, were erroneous. (Id.) Given this, the GLO asserts the Service acted arbitrarily and capriciously in discounting this data in its Second 90-Day Finding because courts recognize that conflicting scientific information in petitions for delisting requires a positive 90-day finding. (Id.)

Among others, the GLO further contends the Service impermissibly discounted evidence which suggests that original data on the Warbler in 1990 underestimated Warbler population and habitat, and that the Service continues to rely on outdated studies which utilized primitive aerial imaging. (Dkt. # 55 at 29–30.) According to the GLO, recent studies confirm the inherent limitations in previous studies, and that a reasonable person could now find that the Warbler was improperly listed in 1990. (Id.) The GLO maintains the Service ignores this

evidence, stating in its Second 90-Day Finding that the Petition "does not report any new data or study results regarding the warbler," and "represent[s] new estimates rather than indicators of positive trends in [W]arbler habitat and population size, and thus do not imply recovery." (Id. (citing AR at 198, 8097).)

Additionally, the GLO criticizes the Service's findings that the Petition fails to provide data on habitat destruction and fragmentation, and disease and predation. (Id. at 31–32.) The GLO also asserts the Petition adequately addressed the sufficient protection provided to the Warbler by existing regulatory mechanisms. (Id. at 32.) The GLO maintains that the Petition presented more than what is required at the 90-day review stage to warrant a positive finding and proceed to the 12-month review. (Id.)

Regarding the GLO's arguments, the Federal Defendants first respond that the GLO has misapplied the ESA's implementing regulations which, at the time the Petition was submitted, permitted delisting a species if the species was "neither endangered nor threatened" because the "[o]riginal data for *classification*" was "in error." (Dkt. # 56 at 19–20 (citing 50 C.F.R. § 424.11(d)(3) (2014) (emphasis in original).) Classification, according to the Federal Defendants, simply means the assignment of animals into specific taxonomic categories, and the Petition failed to provide evidence that the original data classification for the Warbler in 1990 was in error at the time of listing. (Dkt. # 56 at 20.) Therefore,

40

the Federal Defendants maintain the Service appropriately concluded that the Petition did not present substantial information that delisting was warranted on this basis.  (Id.)

Federal Defendants further argue that the GLO incorrectly interprets the 2014 language used in § 424.11(d)(3) to mean that a species' listing was "in error" if any subsequent data improves from the data known at the time of listing.  (Dkt. # 56 at 21.)  The Federal Defendants contend that science is in a constant state of change and that if improved understanding of a species warrants declassification, it would result in "vast ramifications" for the more than 1,600 listed endangered species.  (Id.)  Therefore, because the Petition lacks any information which calls into question the Warbler's taxonomy as it was understood at the time of listing, the Federal Defendants argue that Petitioners have failed to meet their burden to present substantial information that delisting may be warranted on erroneous classification data at the time of listing.  (Id. at 21–22.)

Furthermore, the Federal Defendants posit once again that the Second 90-Day Finding considered all of the information presented in the Petition and reasonably concluded that it did not present substantial information that delisting was warranted under the § 1533 factors.  (Dkt. # 56 at 22.)  Because many of the Petition's cited studies documented "serious and ongoing threats to the Warbler, particularly from habitat loss and fragmentation," the Federal Defendants assert

41

that the Service "exercised its scientific expertise and rationally concluded that a reasonable person would find that the Petition did not provide substantial information indicating that delisting the Warbler may be warranted." (Id. at 22–23.)

To the extent the parties raise any new arguments, the Court has already found the Service acted arbitrarily and capriciously in denying the Petition. Therefore, on remand, the Service should consider each of the arguments raised by Petitioners in this section.  Nevertheless, the Court finds the Service properly considered whether the original classification was made "in error."  The Second 90-Day Finding considered each of the five statutory factors in regard to the Petition, finding that "[n]o information [was] presented that would suggest that the species was originally listed due to an error in information," and that the Warbler "is a taxonomically unique species and was shown to be in danger of extinction at the time of the listing." (AR at 8094.)  Still, the Court must reject the Federal Defendants' argument regarding whether "classification" in the statute refers only to the assignment of animals into specific taxonomic categories and accept the GLO's interpretation of the phrase as referring to the determination that a species is threatened or endangered.[8]

---

[8] The term "classification" in any case was removed from the language in the statute in 2019.  Compare 50 C.F.R. § 424.11(d)(3) (2014), with 50 C.F.R. § 424.11(e)(1)–(3) (2019).

42

Regarding disease and predation, the Second 90-Day Finding found that the Petition was conclusory in asserting that the Warbler was not ever in danger of disease or predation, and that Petitioners did not include any data supporting this statement.  Still, the Federal Defendants acknowledge that the Petition cites several studies documenting predation of Warbler nests and nestlings by fire ants, snakes, mammals, and other birds, but the Service determined that the Petition minimizes or mischaracterizes the threat of predation.  Again, on remand the Service should consider whether the cited evidence is in fact a mischaracterization of the evidence or simply a conflict in the evidence, warranting further review pursuant to the ESA.

Next, the Service determined that the Petition failed to present substantial information demonstrating that adequate regulatory mechanisms exist to protect the Warbler if it were delisted.  In so doing, the Service considered the Petition's arguments concerning the Migratory Bird Treaty Act and the Texas Endangered Species Act, noting that, while these laws make it illegal to capture, take, or kill a Warbler, they do not "prohibit[] habitat destruction, which is an immediate threat to the warbler."  (AR at 8102.)  The Second 90-Day Finding also discussed existing land protection programs, determining these were not adequate because approximately 29% of existing breeding habitat was lost between the years of 1999–2001, and 2010–2011.  (AR at 1921.)  And the Federal Defendants point

43

out that many of these land protection programs exist only due to a species' ESA listing and could be discontinued if the species is delisted.  The Service should consider each of the Petition's points regarding existing regulatory mechanisms again on remand.[9]

Regarding the other natural or manmade factor, the Second 90-Day Finding considered the Petition's arguments concerning the effects of oak wilt, wildfire, habitat management, and noise on Warblers.  (AR at 8105.)  The Service agreed with the Petition that noise was not a significant threat to the Warbler, and that the Petition acknowledged that pairing success for male Warblers decreased in areas suffering from oak wilt.  (Id. at 5843–51, 8105.)  However, the Service determined that the Petition failed to present any studies which cast doubt on the conclusion that oak wilt occurs in Warbler habitat and therefore is a potential threat to Warbler survival.  Additionally, the Second 90-Day Finding identified wildfire, the lack of proscribed fire, and inappropriate use of Warbler habitat to other land uses as threats to the Warbler and which were not adequately addressed in the Petition.  The Service should consider again on remand whether the Petition presented substantial information that delisting is warranted on this basis,

---

[9] The Court does not decide in this Order whether there was sufficient information before the Service to constitute "substantial information" that existing regulatory mechanisms were adequate.  On remand, the Service should take into account any new developments that exist regarding federal and state protections.

44

determining whether there is simply a conflict in the evidence on the points or if the Petition's cited studies in this regard are unreliable.  See Kempthorne, 2007 WL 163244, at *4.

   VI.   Critical Habitat

        The GLO also takes issue with the Service's failure to designate critical habitat for the Warbler, despite the species' listing for over three decades, and because the Service considers habitat destruction to be one of the primary threats to the Warbler.  (Dkt. # 55 at 34–35.)  The GLO argues that the Service's failure to designate critical habitat "violates its mandatory duty under § 1533(a)(3)(A), and undercuts its denial of the Petition."  (Id.)

        In response, the Federal Defendants assert that the GLO's argument is barred for several reasons: (1) it did not plead this claim in its complaint; (2) the Petition did not argue that delisting may be warranted based on the lack of designated critical habitat and the GLO cannot now bring the argument; and (3) it is barred by the doctrine of res judicata because the Court already ruled against this claim in General Land Office I.  (Dkt. # 56 at 35.)

        In General Land Office I, the Court concluded the following:

   [U]nder the plain text of the ESA, the Service's refusal to designate
   critical habitat at the 90-day stage was neither arbitrary nor capricious.
   The ESA directs the Service to consider five factors—and only five
   factors—in determining whether delisting a species may be warranted:
   (1) the present or threatened destruction, modification, or curtailment
   of the habitat or range of the species; (2) overutilization of the species

45

for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting the continued existence of the species. 16 U.S.C. § 1533(a)(1). The ESA therefore "makes clear that the question of whether a species is endangered or threatened is a scientific decision in which economic factors must not play a part." M. Lynne Corn et al., Cong. Research Serv., RL 31654, <u>The Endangered Species Act: A Primer</u>, at 5 (2012); <u>see</u> H.R. Rep. No. 97-567, at 12 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2812 (explaining that economic considerations were eliminated from the listing process because "[w]hether a species has declined sufficiently to justify listing is a biological, not an economic, question"). By contrast, the Service may designate a critical habitat where prudent or determinable only after considering, inter alia, "the economic impact" of making such a designation. 16 U.S.C. § 1533(b)(2). The ESA therefore requires the Service to consider different factors in a listing determination than those considered in designating critical habitat. Consequently, the claim that the Service must either designate critical habitat or delist the Warbler finds no support in the statute. <u>See</u> <u>Alabama-Tombigbee Rivers Coal. v. Kempthorne</u>, 477 F.3d 1250, 1270-71 (11th Cir. 2007) (refusing to delist a species despite the Service's failure to designate critical habitat by reasoning that "[r]emoving one protection is not a fit remedy for the lack of another").

<u>Gen. Land Office I</u>, 2019 WL 1010688 at *10.  Although the Court also noted that it "is troubled by the Service's consistent dilatoriness in designating critical habitat," it still held that "nothing in the ESA compelled the Service to make a critical habitat designation concurrent with its 90-day finding that the Warbler remained endangered."  <u>Id.</u>  As this Court previously determined and from which it finds no reason now to depart from that decision,[10] "the Service's failure to

---

[10] The GLO did not appeal this part of <u>Gen. Land Office I</u> to the Fifth Circuit Court of Appeals.

designate critical habitat did not render its 90-day finding arbitrary and capricious." Id.

VII.   Conclusion

The role of a district court in reviewing agency action under the APA is limited.  Here, the question before the Court is not whether the Warbler should be delisted as endangered or even whether delisting "may be warranted," 16 U.S.C. § 1533(b)(3)(A)—and the Court has no view on those questions.  Rather, the Court simply holds that the Service applied the wrong standard in considering the Petition.  This conclusion does not dictate or suggest that the statutory standard for proceeding to a 12-month review is satisfied, and, without such a finding, the Service's statutory duty to undertake such a review under Section 1533(b)(3)(B) is not triggered.  Despite the GLO's arguments to the contrary, for the Court to order otherwise would be to disregard the statutory text.

This conclusion is consistent with settled law under the APA.  "[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end," and, ordinarily, "the case must be remanded to the agency for further action consistent with the corrected legal standards."  PPG Indus., Inc. v. United States, 52 F.3d 363, 365 (D.C. Cir. 1995); accord N. Air Cargo v. U.S. Postal Serv., 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency

47

acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal."). Accordingly, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). This is precisely what the Fifth Circuit did in this very situation.

There are no rare circumstances presented to the Court such that remand is not appropriate. Although the Service has twice failed to employ the correct evidentiary standard in reviewing the long-pending Petition, there is no reason to believe that the agency is acting in bad faith or that it is unprepared to adhere to the Court's decision. Nor is this a case in which the Service so departed from the usual process for conducting a 90-day review that its 90-day review, "[i]n effect, . . . constituted the beginning of a [12-month] status review." Colo. River Cutthroat Trout v. Kempthorne, 448 F. Supp. 2d 170, 178 (D.D.C. 2006). While it is true that the Petition is now over nine years old, the Court notes that it still remains unclear whether there is a sufficient basis proceed to the next stage of the ESA process, and, in light of the substantial amount of work done to date, the Service should be able to answer that question promptly.

48

The Court is also unpersuaded that it should order the Service to issue a new finding within 90 days.  The statute, of course, compels the agency to act within 90 days "[t]o the maximum extent practicable."  16 U.S.C. § 1533(b)(3)(A).  This is not a license to take 120 or 150 days, if it is possible to act sooner.  But Congress anticipated that, under some circumstances, the Service might be unable to reach a decision in 90 days, and the Court cannot, based on the present record, exclude such a possibility here in light of the Service's new forthcoming five-year review.  To ensure that the Service moves as quickly as "practicable," however, and in light of the lengthy delay to date and the substantial work that the Service has already completed, the Court will require the parties to file a joint status report within 90 days of this decision, updating the Court about the status of the proceeding on remand.

<u>CONCLUSION</u>

Because the Court concludes that the Service's Second 90-Day Finding was arbitrary and capricious, the Court will **GRANT** the GLO's Motion for Summary Judgment (Dkt. # 55), **DENY** the Service's Combined Cross-Motion for Summary Judgment (Dkt. # 56), and **DENY** Save Our Springs's Cross-Motion for Summary Judgment (Dkt. # 58).  It is **ORDERED** that the Service's Second 90-Day Finding is **VACATED** and **REMANDED** to the Service for further

49

consideration consistent with this Order.  The Clerk's Office is **INSTRUCTED** to

**ENTER JUDGMENT** and **CLOSE THE CASE**.

IT IS SO ORDERED.[11]

**DATED:** Austin, Texas, September 5, 2024.

_____

David Alan Ezra
Senior United States District Judge

---

[11] This Court, as noted above, is not unmindful that Federal Defendants are scheduled to issue a new five-year review regarding the Warbler which could come at any time.  Unfortunately, a district court has an unflagging duty to properly rule in a reasoned fashion on pending motions and the parties have not requested this Court delay its filing.  That said, a new filing by Federal Defendants may well moot, in whole or part, the arguments raised in this matter by both parties and this Order.